479 S.E.2d 876

**WHEELING PARK COMMISSION, Plaintiff Below, Appellee,**

**v.**

**HOTEL AND RESTAURANT EMPLOYEES, INTERNATIONAL UNION, AFL–CIO ("International"), an Unincorporated Labor Organization; Hotel Employees and Restaurant Employees Local 57, AFL–CIO ("Local 57"), an Unincorpo-**

---

rated Labor Organization; Louis Sanfi-
lippo, Arthur Tatangelo, Nancy Ross,
Edward Nassan, George Ross, Darrel
Brown, John Davis, Tyrone Martin,
Irma Martin, Daryn Sipes, Jessie Case,
Matt Arnold and Various John Does, All
Being Officers and Members of the In-
ternational and Local 57, Individually
and as Representatives of the Class of
All Other Unknown Persons who are
Officers, Members or Otherwise Acting
on Behalf of the International and Lo-
cal 57, Who are Participating in Certain
Concerted Activities and Unlawful and
Disruptive Conduct at Oglebay Park, on
Behalf of Themselves and All Other Per-
sons Participating in Said Activities, De-
fendants Below, Appellants.

No. 23448.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 11, 1996.

Decided Nov. 18, 1996.

whether the appellant could still be sent to the Davis Center, as originally ordered by the circuit court. The Court perceived that there might be a problem in light of the fact that the appellant has turned nineteen years of age during the pendency of the present appeal. (Appellant was born May 17, 1977.)

In discussions with officials from the Davis Center, I have been informed that there is no age restriction pertaining to persons who can be sent to the facility, so long as the juvenile court retains jurisdiction pursuant to W.Va. Code sec. 49–5–2(f). Section 49–5–2(f) states that 'the jurisdiction of the court which adjudged the juvenile a delinquent shall continue until the juvenile becomes twenty-one years of age.'

Consequently, there is no impediment to the implementation of the circuit court's original recommendation that appellant be sent to the Davis Center, providing that the appellant has not reached the age of twenty-one when the order is given effect. Indeed, an official from the Davis Center informed me that they routinely take nineteen year olds and, although relatively rare, have taken custody of twenty-year-olds in the past.

**218**

Patrick S. Cassidy, Timothy F. Cogan, Wray V. Voegelin, Cassidy, Myers, Cogan, Voegelin & Tennant, L.C., Wheeling, for Appellants.

William A. Kolibash, Phillips, Gardill, Kaiser & Altmeyer, Wheeling, Thomas A. Smock, Sally Griffith Cimini, Polito & Smock, P.C., Pittsburgh, PA, for Appellees.

1. For simplicity we refer to HERE for all of the appellants in the case before us. The appellants are HERE; Hotel Employees and Restaurant Employees Local 57, AFL–CIO ("Local 57"), an unincorporated labor organization; Louis Sanfilippo, Arthur Tatangelo, Nancy Ross, Edward Nassan, George Ross, Darrel Brown, John Davis, Tyrone Martin, Irma Martin, Daryn Sipes, Jessie Case, Matt Arnold and various John Does, all being officers and members of the International and Local 57, individually and as representatives of the class of all other unknown persons who are officers, members or otherwise acting on behalf of the International and Local 57, who are participating in certain concerted activities and unlawful and disruptive conduct at Oglebay

McHUGH, Chief Justice:

The Hotel and Restaurant Employees International Union, AFL–CIO–CLC (hereinafter "HERE") [1] appeals the December 8, 1995 order of the Circuit Court of Ohio County which granted a preliminary injunction restricting HERE's union organizing activities at Oglebay Park in Wheeling. The appellee is the Wheeling Park Commission. For reasons explained below, we [2] reverse and remand the case to the circuit court.

### I.

Oglebay Park is owned, operated, managed and maintained by the Wheeling Park Commission which was formed in 1925 in order to manage municipal parks acquired by the City of Wheeling. *See West Virginia Acts,* Regular Session, 1925, chapter 6. Oglebay Park is a 1500–acre public resort consisting of, *inter alia,* several golf courses, swimming pools, tennis courts, a children's zoo, a nature center, and a lodge known as Wilson Lodge. Wilson Lodge contains, bars, restaurants, a gift shop and hotel rooms. Additionally, Wilson Lodge has rooms for conventions, parties, and banquets.

In the fall of 1995 HERE began conducting a labor union organizational campaign at Oglebay Park. More specifically, HERE's goal was to organize the hotel and restaurant employees working at Wilson Lodge. The labor union unit would consist of 150 employees, 110 of whom, according to HERE, have already signed authorization cards indicating they want the union to represent them.

Park, on behalf of themselves and all other persons participating in said activities.

2. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

In order to accomplish its goal, HERE handed out leaflets in several locations of Oglebay Park, placed leaflets on cars in the parking lot, and put leaflets under the doors of the hotel in the park. Additionally, a HERE representative who was dressed in a rat costume sat in the dining room of Wilson Lodge and stood outside the entrance of Wilson Lodge. HERE also used a bullhorn to convey its message on at least one occasion. Additionally, HERE stationed people by the donation boxes for the Festival of Lights, an organized light show put on by the Wheeling Park Commission in Oglebay Park during the winter season, asking patrons to not make donations.

The Wheeling Park Commission asserts that HERE's organizers, *inter alia*, obstructed the traffic flow into the park and interfered with the ingress and egress of bus passengers. Furthermore, the Wheeling Park Commission maintains that HERE's organizers intimidated the Oglebay Park patrons and staff. For example, the Wheeling Park Commission states that a maid complained that HERE organizers were looking at her through a window and laughing as she made up a guest room in the hotel at the park. The Wheeling Park Commission also asserts that HERE organizers identified themselves as Wheeling Park Commission employees and walked into a guest room to hand a maid, who was cleaning the room, union literature thereby intimidating her.

The Wheeling Park Commission on several occasions asked HERE representatives not to engage in certain activities and not to conduct certain activities in certain areas of the park. The Wheeling Park Commission maintains that its requests were not aimed at the message being conveyed by HERE, but instead, were directed at the manner in which the message was being conveyed.

Conversely, HERE asserts that they only had at most eight or ten people who engaged in leafleting. According to HERE, there was no picketing. Furthermore, HERE

maintains that it never blocked the roads or sidewalks. Thus, HERE concludes that the Wheeling Park Commission's request that HERE only picket in certain areas was aimed at limiting their message to the public. HERE notes that the Wheeling Park Commission did not offer any direct evidence that its patrons or staff felt intimidated by HERE's presence. In fact, HERE asserts that the only evidence presented by the Wheeling Park Commission that patrons were intimidated was that six people complained about leaflets being put under the hotel room doors and one tour bus director complained about HERE's activities. HERE also notes that the Wheeling Park Commission employed security personnel who wore black camouflage outfits to monitor the HERE representatives.

This disagreement with the union representatives of HERE led the Wheeling Park Commission to file a complaint in the Circuit Court of Ohio County on December 6, 1995, requesting injunctive relief. HERE filed an initial answer on December 6, 1995, and the circuit court held an evidentiary hearing on the same date. At the hearing only two people testified: one representative of HERE and one representative of the Wheeling Park Commission.

Subsequently, the circuit court issued a preliminary injunction order on December 8, 1995 which permitted HERE to have (1) four representatives picket at Wilson Lodge; (2) four representatives picket at the Visitor's Center; and (3) two representatives to put leaflets on vehicles parked in the Wilson Lodge parking area. The order prohibited HERE from (1) picketing inside Wilson Lodge; (2) using a bullhorn; (3) blocking buses; (4) holding themselves out as employees or official greeters of the Wheeling Park Commission; and (5) blocking, picketing or leafleting in the turnaround area of the main entrance of Wilson Lodge. The order further restrained both parties from following, harassing or otherwise intimidating each other in any manner.[3] It is this order which is

---

3. We note that the National Labor Relations     Board held on March 20, 1996, that it did not

the subject of the appeal which is now before this Court.[4]

## II.

■ The issue before this Court is whether the December 8, 1995 preliminary injunction violates HERE's right to free speech found in the First Amendment of the *Constitution of the United States* and article III, § 7 of the *Constitution of West Virginia*.[5] We are mindful that

[i]n reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp.*, 168 W.Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo. Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996).

Syl. pt. 1, *State v. Imperial Marketing*, 196 W.Va. 346, 472 S.E.2d 792 (1996). As we will

have jurisdiction over this dispute because the Wheeling Park Commission is a political subdivision and as such is exempt from the National Labor Relations Act found in 29 U.S.C. § 151, *et seq.*

4. As stated by the Wheeling Park Commission in its response to the petition for appeal, an appeal of an injunction is governed by *W. Va.Code*, 53–5–8 [1955] which states, in relevant part: "Questions may be certified and appeals may be taken in injunction proceedings as in any other cases in equity." Appeals in equity must be in accord with *W. Va.Code*, 58–5–1 [1925] which states, in relevant part, that "[a] party to a controversy in any circuit court may obtain from the supreme court of appeals … an appeal from … a judgment, decree or order of such circuit court … in any case in chancery wherein there is a decree or order dissolving or refusing to dissolve an injunction[.]" Additionally, *W. Va.Code*, 53–5–5 [1923] gives this Court original jurisdiction over proceedings when a circuit court refuses to award an injunction.

In the case before us, the record is devoid of an order by the circuit court which dissolved or refused to dissolve the injunction at issue. Thus, the question of whether this Court has jurisdiction is raised. However, we have stated that "when an appeal presents a jurisdictional [quandary], yet the merits of the underlying issue, if reached, will in any event do no harm to the party challenging jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the case on the merits." *Province v. Province*, 196 W.Va. 473, 481, 473 S.E.2d 894, 902 (1996) (*citing Norton v. Mathews*, 427 U.S. 524, 530–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976); *Secretary of Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974)).

Our decision in the case at bar does not harm any of the parties. As we will explain more fully in this opinion, this Court concludes that the circuit court did not apply the appropriate legal principles when granting the preliminary injunc-

tion in the first instance. Furthermore, the record indicates that the circuit court was in effect refusing to dissolve the preliminary injunction given that it stated that it would not review the appropriateness of the preliminary injunction until it evaluated the legal nature of Oglebay Park. If the circuit court had entered an order which dissolved or refused to dissolve the injunction, then the same issue would have been before us. Thus, although HERE should have sought an appropriate order as required by *W. Va.Code*, 58–5–1 [1925] before seeking the appeal, dismissing this case for lack of jurisdiction in these circumstances would not be the best utilization of judicial time and resources. Accordingly, this Court will outline the legal principles which should be applied by a circuit court when determining whether an injunction which restricts a person's or group's constitutional right to free speech is appropriate.

Unfortunately, *W. Va.Code*, 58–5–1, *et seq.*, regarding appellate relief in this Court, lacks conformity with current practice. We encourage the West Virginia legislature to examine *W. Va.Code*, 58–5–1, *et seq.*, and amend it recognizing that such statutory amendments may not conflict with *W. Va. Const.* art. VIII, § 1, *et seq.*

5. *U.S. Const.* amend. I states that "[c]ongress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

*W.Va. Const.* art. III, § 7 states:

No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

more fully explain below, the circuit court failed to apply the proper legal standards when it evaluated whether the facts before it supported the granting of a preliminary injunction. Thus, we are presented with a question of law which we review *de novo.*

We begin our analysis by examining the various standards that are used to determine whether a person's constitutional right to free speech has been violated.[6] There are three general questions which this Court must consider before determining what standards should be used to make such an evaluation: (1) what is the forum in which the communicative activity was conducted; (2) whether the restriction on communicative activity is content-neutral or content-based, and (3) whether the restriction on communicative activity is in the form of a statute or an injunction.

### A.

### *The Forum*

Although neither party questions whether Oglebay Park is a public forum, we do not find the resolution of this issue to be so simplistic as the following general overview of the three categories of government-owned property reveals.

The first category of government-owned property is known as the traditional public forum and includes places which have traditionally been devoted to assembly and debate, such as parks and streets. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*

460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794, 804 (1983). The government's right to restrict communicative activity in these places is very limited:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' ... In these quintessential public forums, the government may not prohibit all communicative activity.

*Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954–55, 74 L.Ed.2d at 804 (*quoting Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423, 1436 (1939)). *See also United Mine-Workers of America International Union v. Parsons,* 172 W.Va. 386, 393, 305 S.E.2d 343, 350 (1983) (Places which constitute public forums include streets, parks, and sidewalks).

The government's power to restrict communicative activity by statute, ordinance or regulation in a public forum depends upon whether the restriction is content-based or content-neutral. If the restriction is content-based, the government must show that its limitation on expressive activity "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n,* 460 U.S. at 45,

---

**6.** This Court must at a minimum apply the standards the Supreme Court of the United States uses to analyze First Amendment issues pursuant to *W. Va. Const.* art. I, § 1 which states: "The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land." *See Pushinsky v. West Virginia Board of Law Examiners,* 164 W.Va. 736, 744–45, 266 S.E.2d 444, 449 (1980). *Cf. Citizen Awareness Regarding Education v. Calhoun County Publishing, Inc.,* 185 W.Va. 168, 171, 406 S.E.2d 65, 68 (1991) ("*W. Va. Const.,* art. III, § 7, was intended to provide at least as much protection to the press as the First Amendment to the *Constitution of the Unit-*

*ed States* provides.") However, this Court has stated that pursuant to the right of the majority to "reform, alter, or abolish" an inadequate government set forth in article III, § 3 of the *Constitution of West Virginia,* more stringent limitations on the government's ability to regulate free speech may be imposed under our constitutional free speech provision than is imposed on the states by the Fourteenth Amendment of the *U.S. Const. Pushinsky, supra.* Thus, in the case before us, we find the Supreme Court of the United States' analysis of the various standards that are applied to First Amendment issues to be instructive because it establishes the floor below which we may not venture.

103 S.Ct. at 955, 74 L.Ed.2d at 804 (*citing Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263, 270 (1980)). If, however, the restriction is content-neutral, then generally the government may enforce regulations restricting the time, place, and manner of expression if the regulations "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804 (*citing United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535–36, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980); *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222, 231–32 (1972); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)).

■ The second category of government-owned property consists of property which the government has opened to the public for communicative activity even though it was not required to create the forum in the first instance. *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 805. *See also Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities); *City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater). Although the government is not indefinitely bound "to ... retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805.

The third category of government-owned property is "[p]ublic property which is not by tradition or designation a forum for public communication [and] is governed by different standards ..." than the strict standards governing the government's right to restrict communicative activity in traditional public forums. *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805 (1983). The Supreme Court of the United States has recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517, 530 (1981) (U.S. mail letterbox, although government property, is not a traditional public forum). *See also Perry Educ. Ass'n, supra* (School mail facilities were not a traditional public forum); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base is not a traditional public forum); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (advertising space found in city rapid transit cars is not a traditional public forum); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (jail or prison is not a traditional public forum). Thus, the Supreme Court of the United States has held that when such a forum is present the state

> [i]n addition to time, place, and manner regulations, ... may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.... As we have stated on several occasions, ' " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " '

*Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805 (*citing* and *quoting Council of Greenburgh Civic Assns.*, 453 U.S. at 129–30, 101 S.Ct. at 2685, 69 L.Ed.2d at 530).

Determining what forum is at issue may be difficult. It is important to remember that

'[t]he truth is that open spaces and public places differ very much in their character, and before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place.' Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question.

*Lehman,* 418 U.S. at 302–03, 94 S.Ct. at 2717, 41 L.Ed.2d at 777 (*quoting* Lord Dunedin, in *M'Ara v. Magistrates of Edinburgh,* [1913] Sess. Cas. 1059, 1073–1074).

Our review of the record indicates that the Oglebay Park resort could consist of more than one forum. Clearly, the open areas of the park fall within the traditional public forum category because they are areas that have historically been used for assembly and debate. However, areas like the hotel rooms and possibly the restaurants may fall within the third category of government-owned property which traditionally have not been used as a forum for public communication and thus, warrant a different analysis than the open areas of the park which may include the parking lots. The question of whether certain areas of Oglebay Park are "in fact 'public forum' may blur at the edges[.]" *Council of Greenburgh Civic Assns.,* 453 U.S. at 132, 101 S.Ct. at 2687, 69 L.Ed.2d at 532.[7]

■ In the case before us, the record is devoid of any determination by the circuit court of what forums would be affected by the preliminary injunction. Determining the nature of the government property that is at issue is crucial in helping a court decide what restrictions on a person's or group's right to free speech are constitutional. This Court is unable to definitively determine what catego-

ries of government property would be present in the case before us because the record is not developed on this issue. Even though other forums could be at issue, because the parties in the case before us focus on the traditional public forum, our focus in the remainder of this opinion will be on the analysis which should be used when determining whether the injunction in the case before us impermissibly restricts speech made in a public forum.

### B.

*Content-based v. Content-neutral*

■ In that a more stringent standard applies when the restriction imposed by the government is content-based rather than content-neutral, we begin with HERE's assertion that the preliminary injunction, in the case before us, is content-based because it directly limits their message. An argument similar to HERE's was made before the Supreme Court of the United States in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). In *Madsen* the Supreme Court of the United States was confronted with whether an injunction entered by a Florida state court which prohibited antiabortion protestors from demonstrating outside of a health clinic in certain places and in certain ways violated the First Amendment guarantee of free speech. *Id.* The antiabortion protestors in *Madsen* argued that because the injunction restricted only the speech of antiabortion protestors, the restriction was content-based. The Supreme Court of the United States disagreed.

■ The Supreme Court of the United States noted that "[a]n injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past ac-

---

7. Although the record is unclear, arguably areas of Wilson Lodge or other areas of the resort could have been designated by the Wheeling Park Commission as areas for expressive activity, and thus, fall within the second category of gov-

ernment-owned property. Because there is no record on the issue of forums, this Court is not able to determine what other forums, if any, other than the traditional public forum are present at Oglebay Park.

tions in the context of a specific dispute between real parties." *Id.* at 762, 114 S.Ct. at 2523, 129 L.Ed.2d at 606. The principal inquiry "in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" *Id.* (*citing Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)). Thus, a court's threshold consideration is the government's purpose in restricting the communicative activity. *Madsen,* 512 U.S. at 761–62, 114 S.Ct. at 2523, 129 L.Ed.2d at 606.

In the case before us, the preliminary injunction did not focus on the content of HERE's speech. Indeed, the preliminary injunction in no way restricts or dictates the content of HERE's message. Instead, the purpose of the preliminary injunction was to restrict HERE to certain locations and numbers of people within Oglebay Park. Thus, we conclude that the restrictions imposed on HERE's communicative activities by the injunction are not content-based. Therefore, we must apply the standard used to evaluate content-neutral restrictions imposed by the government on constitutionally protected communicative activity. Initially, however, we must examine whether the standard set forth in *Perry Educ. Ass'n, supra,* for analyzing whether a content-neutral statute, ordinance or regulation is constitutional applies to the case before us or whether content-neutral restrictions on communicative activity imposed by an injunction warrant a different analysis.

### C.

#### Statute v. Injunction

As we have previously stated, if the government's restriction on communicative activ-

ity in a public forum is found in a content-neutral statute, ordinance, or regulation, then the statute's, ordinance's or regulation's constitutionality would be assessed by determining whether the time, place, and manner restrictions were "narrowly tailored to serve a significant government interest, and [left] open ample alternative channels of communication." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804 (citations omitted). In fact, although the record is not clear, it appears that the circuit court in the case before us applied this standard when it entered the preliminary injunction.[8]

■ Recently, however, the United States Supreme Court in *Madsen, supra,* has made clear that because there are differences between a statute, ordinance or regulation and an injunction, a more stringent standard should apply when analyzing whether an injunction unconstitutionally restricts a person's or group's right to free speech:

> There are obvious differences, however, between an injunction and a generally applicable ordinance. Ordinances represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree.... Injunctions also carry greater risks of censorship and discriminatory application than do general ordinances. '[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.' *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 112–113, 69 S.Ct. 463, 466–467, 93 L.Ed. 533 (1949).

8. The December 8, 1995 order granting the preliminary injunction is silent as to what standard the circuit court used to evaluate the constitutional guarantee to free speech issue. However, we base our belief that the circuit court applied the above standard on the fact that it stated at the December 6, 1996 hearing that "as to place and manner and reasonable access, at least at this point in time, the Court sees the position that I have as being, one, to prevent irreparable harm from occurring to the Wheeling Park Commis-

sion, really, in terms of its busiest people season[.]"

The circuit court also stated at the December 6, 1996 hearing that the issue before it was to lay "ground rules here, because I [have] always kind of seen the Court's position to be as a referee, to make sure the sides have got notice, to set up what is or is not reasonable in terms of numbers."

Injunctions, of course, have some advantages over generally applicable statutes in that they can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred....

We believe that these differences require a somewhat more stringent application of general First Amendment principles in this context.... Accordingly, when evaluating a content-neutral injunction, we think that our standard time, place, and manner analysis is not sufficiently rigorous.

*Madsen*, 512 U.S. at 765, 114 S.Ct. at 2524–25, 129 L.Ed.2d at 607–08 (citations and footnote omitted). Instead, "[w]e must ask ... whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Id.* at 764, 114 S.Ct. at 2525, 129 L.Ed.2d at 608 (citations omitted). *See also Pro–Choice Network of Western New York v. Schenck*, 67 F.3d 377 (2d Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 1260, 134 L.Ed.2d 209 (1996) (Applied standard set forth in *Madsen* for evaluating whether a content-neutral injunction violated a group's First Amendment right to free speech).

Not only is this Court required at a minimum to adopt the above standard pursuant to *W. Va. Const.* art. I, § 1, *see* n. 6, *supra*, but we also find the Supreme Court of the United States' analysis to be sound.[9] As previously stated, an injunction is, by its very nature, focused on one person's or group's communicative activities. Thus, a standard that is more stringent than the reasonable time, place, and manner standard is necessary when evaluating whether a content-neutral injunction would unconstitutionally restrict a person's or group's communicative activities in a public forum in order to ensure that courts do not impermissibly muzzle minority voices.[10] The major purpose behind " '[t]he protection given speech and press was ... to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *West Virginia Citizens Action Group, Inc. v. Daley*, 174 W.Va. 299, 304, 324 S.E.2d 713, 718 (1984) (*quoting Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957)). An injunction should not be used in a manner that prevents a person or group from sharing their ideas on how political and social changes should be brought about unless

**9.** We note that *Madsen* was decided on June 30, 1994, and thus, is applicable to the case now before us which was filed on December 6, 1995. Furthermore, we note that Justice Scalia, in a dissenting opinion in *Madsen*, wrote that content-neutral injunctions should be evaluated by the strict scrutiny standard used to evaluate a statutory, content-based restriction. *Madsen*, 512 U.S. at 790–91, 114 S.Ct. at 2538, 129 L.Ed.2d at 624 (Scalia, J., dissenting). Justice Scalia stated that

[t]he danger of content-based statutory restrictions upon speech is that they may be designed and used precisely to suppress the ideas in question rather than to achieve any other proper governmental aim. But that same danger exists with injunctions. Although a speech-restricting injunction may not attack content *as content* ..., it lends itself just as readily to the targeted suppression of particular ideas. When a judge, on the motion of an employer, enjoins picketing at the site of a labor dispute, he enjoins (and he *knows* he is enjoining) the expression of pro-union views.

*Id.* at 792–93, 114 S.Ct. at 2538, 129 L.Ed.2d at 624–25 (emphasis provided). Although *W. Va.*

*Const.* art. III, § 3 authorizes this Court to adopt the more stringent standard recommended by Justice Scalia, *see* n. 6, *supra*, we decline to do so, as we find that the majority's opinion in *Madsen* strikes a better balance.

**10.** This Court has already recognized the importance of restricting the use of an injunction when it affects the right to free speech:

Where jurisdiction over a labor dispute has not been preempted by National Labor Relations Board jurisdiction, a state may regulate picketing by injunction if the injunction has a reasonable basis in prevention of disorder, protection of life or property, or promotion of the general welfare as defined by state law; however, such injunction must be specifically directed to acts or conduct which are designed to accomplish an illegal purpose, and not include those which keep within the protected area of free speech.

Syl. pt. 1, *United Maintenance and Manufacturing Co., Inc. v. United Steelworkers of America*, 157 W.Va. 788, 204 S.E.2d 76 (1974). *See also* syl. pt. 3, *P.G. & H. Coal Co., Inc. v. International Union, United Mine Workers of America*, 182 W.Va. 569, 390 S.E.2d 551 (1988).

there is a significant government interest at stake.[11]

Accordingly, we hold that when evaluating whether an injunction's content-neutral restrictions on a person's or group's speech in a public forum is constitutional pursuant to *W. Va. Const.* art. III, § 7, as opposed to evaluating a content-neutral statute, ordinance or regulation, the freedom of speech provision, the standard time, place, and manner analysis of the restrictions is not sufficiently rigorous. Instead, a court must ensure that the content-neutral restrictions in the injunction burden no more speech than necessary to serve a significant government interest.

In the case before us, the circuit court did not use the above standard and, thus, did not determine that the restrictions in its preliminary injunction burdened no more speech in a public forum than was necessary to serve a significant government interest. Furthermore, as we have previously indicated, the circuit court did not decide whether areas like the hotel rooms are government properties that have not traditionally been devoted to assembly and debate, and thus warrant different considerations than areas that are considered public forum.

Therefore, we reverse the December 8, 1995 order of the circuit court and remand with directions for the circuit court to first determine what forums are at issue and then to apply the appropriate standards for analyzing whether the restrictions imposed by an injunction would unconstitutionally restrict a person's or group's speech. The right to free speech is a very important right under our state and federal constitutions. Before that right is restricted, a court should carefully examine the facts. Thus, if the circuit court on remand should find that injunctive relief is still warranted in the case before us, the circuit court should clearly set forth in its order the facts which support the restrictions imposed on HERE's constitutional right to free speech.

Reversed and remanded.

RECHT, Judge, sitting by temporary assignment.

---

11. This Court noted in *State v. Imperial Marketing*, 196 W.Va. 346, 352 n. 8, 472 S.E.2d 792, 798 n. 8 (1996) that

[t]he customary standard applied in West Virginia for issuing a preliminary injunction is that a party seeking the temporary relief must demonstrate by a clear showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law; and the necessity of a balancing of hardship test[.]

(*citing Jefferson County Bd. of Educ. v. Jefferson County Educ. Ass'n,* 183 W.Va. 15, 24, 393

S.E.2d 653, 662 (1990)). The circuit court made reference to preventing "irreparable harm" to the Wheeling Park Commission at the December 6, 1995 hearing. *See* n. 8, *supra.* We note that while the above standard generally applies when issuing a preliminary injunction, the more specific standards for First Amendment issues set forth by the United States Supreme Court apply when issuing a preliminary injunction which affects constitutionally protected speech.