No. 14-1332 - *Wheeling Park Commission v. Joseph Dattoli and Kerry Dattoli, his wife*

**FILED**

**June 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Davis, Justice, dissenting, joined by Justice Workman:

This was a simple case in which the court was asked to decide whether the Dattolis made out a *prima facie* case of negligence against the Commission. In resolving this issue, the majority of the court found a distressing way to blur the lines between legal principles that apply to premises liability causes of actions and actions for injury on property owned by political subdivisions. In doing so, the majority opinion found that the trial court erred in denying the Commission's motion for judgment as a matter of law at the close of the Dattolis' case-in-chief. For the reasons set out below, I respectfully dissent.

### A. Relevant Facts

Ordinarily I would begin my dissent by going to the merits of my disagreement with the majority opinion. However, to properly understand the legal unsoundness of the majority opinion, I am compelled to start with a recitation of the underlying facts.

1

The facts of this case began at around noon, on September 1, 2007, at Oglebay Park Resort and Conference Center ("the Park") in Wheeling, West Virginia.[1] At that time, the Dattolis were attending a family reunion at the Park. The family reunion was being hosted by Mrs. Dattoli's family.[2] Also on that date, the Park was holding an event that was called Fort Henry Days. As a result of this special event, there were a number of amusement attractions, including carnival rides, set up throughout the Park.

After the family members had lunch, Mr. Dattoli accompanied his daughter, son, and daughter-in-law for a walk to view some of the attractions at the Park.[3] At some point, Mr. Dattoli stopped at an area near a wooden fence to watch some amusement events, including his daughter's attempt to ascend a rock climbing wall. It appears that Mr Dattoli's back was to the fence when he attempted to lean against it. As Mr. Dattoli placed his buttocks on the fence and when he reached back to place one of his hands on the fence, the

---

[1]The Park is maintained by the Commission. *See Wheeling Park Comm'n v. Hotel & Rest. Emps., Int'l Union, AFL-CIO*, 198 W. Va. 215, 218, 479 S.E.2d 876, 879 (1996) ("[T]he Wheeling Park Commission . . . was formed in 1925 in order to manage municipal parks acquired by the City of Wheeling.").

[2]Mrs. Dattoli's family had a family reunion at the Park annually. Mrs. Dattoli's grandfather was a carpenter and helped build many of the facilities at the Park. Further, it appears that the Park allowed her grandfather and his family to live in a house in the Park.

[3]Both of Mr. Dattoli's children were adults at the time of the incident.

2

fence broke suddenly, and he fell backwards down a hill. As a result of the fall, Mr. Dattoli

sustained a left shoulder, full thickness, rotator cuff tear that required surgery to repair.[4]

In 2009, the Dattolis filed this action against the Commission to recover for the

damages caused by the accident.[5] After extensive discovery, the case was presented to a jury

in August 2014. During the trial, both Dattolis testified. They also called their former

daughter-in-law, who actually witnessed the fall, to inform the jury of how the accident

occurred. They also called their son to testify about the impact of the injury on the family.

The Dattolis put on a video deposition of the physician who treated Mr. Dattoli for his

injured shoulder. Additionally, they called John Hargleroad ("Mr. Hargleroad"), the director

of operations for the Park. Mr. Hargleroad was called as an adverse witness. Mr. Hargleroad

testified that the Park's wooden fence was installed during the 1990s. Mr. Hargleroad stated

that he did not know of the existence of any documents that would show repairs or

maintenance was done on the fence since it was installed.[6] There also was testimony by Mr.

Hargleroad that wood had a life expectancy (*i.e.*, decaying) and that the Park, not guests, was

in a better position to make certain the fence was in good repair. Mr. Hargleroad also

---

[4]Mr. Dattoli's surgeon described this type of injury as "something where the tendon is completely torn off the bone[.]"

[5]Mrs. Dattoli's claim was for loss of consortium.

[6]The Dattolis had requested such information from the Commission during discovery, but never received documents involving repair or maintenance of the fence.

testified that the Park did not have any signs warning guests not to lean or sit on the fence. Although Mr. Hargleroad stated that Mr. Dattoli should not have leaned on the fence, there was no evidence showing that Mr. Dattoli did anything in violation of a Park rule that contributed to the accident.

At the close of the Dattolis' case-in-chief, the Commission moved the trial court for judgment as a matter of law. The motion was denied. The Commission thereafter rested without calling any witnesses. After the case was submitted to the jury, a verdict was returned awarding the Dattolis $36,894.47 for past medical bills and $19,000.00 for past lost wages. The jury did not award damages for any of the following items listed on the verdict form: past and future physical pain and suffering, past and future mental anguish and emotional pain, past and future loss of enjoyment of life, past and future loss of household services, permanency of injuries, and loss of consortium.

The Dattolis filed a post-trial motion for a new trial on damages. The trial court's order of November 27, 2014, denied the motion, in part, and granted the motion, in part. The order denied the motion for new trial for the following damages: future physical pain and suffering, future mental anguish and emotional pain, past and future loss of enjoyment of life, past and future loss of household services, permanency of injuries, and loss of consortium. The order awarded a new trial on damages for the following limited items:

4

past physical pain and suffering and past mental anguish and emotional pain. The Commission subsequently filed this appeal.

### *B. Denial of Motion for Pre-Verdict Judgment as a Matter of Law*

The Commission argued on appeal that the trial court committed error in denying its motion for judgment as a matter of law at the close of the Dattolis' case-in-chief. It is clear from a review of the Commission's appeal brief and reply brief that the Commission failed to understand the basis of liability in this case. The Commission viewed the case as being grounded on common law premises liability principles. The majority opinion accepted this argument. However, as I will demonstrate, our cases have developed distinct legal principles for premises liability and liability against political subdivisions. Insofar as the Commission did not dispute that it is a political subdivision, the decisions of this Court are clear in stating that premises liability principles simply do not apply to injuries sustained on property belonging to political subdivisions.

**1. Cause of action for injury on property of a political subdivision.** Contrary to the conclusion reached by the majority opinion, it was clearly stated in *Carrier v. City of Huntington*, 202 W. Va. 30, 33, 501 S.E.2d 466, 469 (1998), that "[t]his Court has never applied premises liability theories to personal injury claims arising from injury on

5

public property. Injuries occurring on public property are governed by specific statutes."[7]

Liability against the Commission as a political subdivision is found in W. Va. Code § 29-12A-4(c)(3) (1986) (Repl. Vol. 2013) of the Governmental Tort Claims and Insurance Reform Act.[8] We have explained this statute as follows:

---

[7]In *Carrier,* an action was brought against the defendant, City of Huntington, under a specific statute that allowed political subdivisions to be sued for injuries caused by defective roads, bridges, and streets. The defendant argued that the use of the word "negligence" in the statute permitted this Court to apply premises liability principles to the cause of action, in order to affirm the trial court's summary judgment order in favor of the defendant. We rejected the argument by stating that "[w]e decline to rule that imposing a 'negligence' standard on local governments under W. Va. Code § 17-10-17, permits this Court to apply common law principles developed under premises liability." *Carrier v. City of Huntington*, 202 W. Va. 30, 34 n.6, 501 S.E.2d 466, 470 n.6 (1998).

[8]The Commission asserted in its Reply brief that this statute has "no bearing on the elements of negligence or the evidentiary requirements associated therewith." According to the Commission, "a negligence claim against a political sub-division is governed by the same laws of negligence as claims filed against non-political subdivisions[.]" As mentioned previously, the Commission misunderstands the law in this area. Prior to enactment of the Governmental Tort Claims and Insurance Reform Act, this Court initially permitted political subdivisions to be sued under common law principles when a political subdivision was acting in a proprietary capacity, as opposed to a governmental capacity. *See* Syl. pt. 2, *Ashworth v. City of Clarksburg*, 118 W. Va. 476, 190 S.E. 763 (1937) ("A municipality acts as a proprietor in maintaining a public park. In this capacity, the municipality must exercise ordinary care, and is liable to one injured through a breach of that duty."); *See also Ward v. County Court of Raleigh Cnty.*, 141 W. Va. 730, 739-40, 93 S.E.2d 44, 49 (1956) ("[T]he operation of the lake property by the Raleigh County Park Board, at the time of the  drowning of plaintiff's decedent, was proprietary, not governmental. We find no sound reason for holding a municipality liable for such operations and not holding a public corporation of the nature of the Raleigh County Park Board liable for the same type of operations. If the function is proprietary when performed by a municipality, it is proprietary when performed by such a corporation as the Raleigh County Park Board."). Ultimately, this Court permitted political subdivisions to be sued under common law principles in both their governmental and proprietary capacities. *See* Syl. pt. 11, *Long v. City of Weirton*, 158 W. Va. 741, 214 S.E.2d 832 (1975) ("A municipal

(continued...)

6

Under *W. Va. Code*, 29-12A-4(c)(3) [1986], political subdivisions are liable for injury, death, or loss to persons or property caused by their negligent failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or *public grounds within the political subdivisions open, in repair*, or free from nuisance[.][9]

Syl. pt. 3, in part, *Koffler v. City of Huntington*, 196 W. Va. 202, 469 S.E.2d 645 (1996) (emphasis and footnote added).[10]  *See also* Syl. pt. 4, *Calabrese v. City of Charleston*, 204 W. Va. 650, 515 S.E.2d 814 (1999) ("The liability for political subdivisions created in W. Va. Code, 29-12-4(c)(3) [1986] includes liability for injury, death, or loss to persons or property caused by a subdivision's negligent failure to keep its sewers and drains open, in

---

[8](...continued)
corporation shall be liable, as if a private person, for injuries inflicted upon members of the public which are proximately caused by its negligence in the performance of functions assumed by it."). However, W. Va. Code § 29-12A-4(b)(1) (1986) (Repl. Vol. 2013) expressly provides that, except as provided in W. Va. Code § 29-12A-4(c), "a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *See also Zirkle v. Elkins Rd. Pub. Serv. Dist.*, 221 W. Va. 409, 414, 655 S.E.2d 155, 160 (2007) ("This provision of the Act suggests that political subdivisions . . . are not liable for any acts with respect to both governmental and proprietary functions unless the acts complained of come within the specific liability provisions of W. Va. Code, 29-12A-4(c).").

[9]*See also* W. Va. Code § 29-12A-4(c)(2) ("Political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment.").

[10]The Dattolis noted in their brief that they tendered a jury instruction that specifically used language contained in W. Va. Code § 29-12A-4(c)(3). The jury charge in the record does not show that the trial court accepted the instruction. However, the manner in which the trial court instructed the jury on any issue in the case was not assigned as an error on appeal to this court.

7

repair, or free from nuisance."), *modified on other grounds by Posey v. City of Buckhannon*, 228 W. Va. 612, 723 S.E.2d 842 (2012); *Stamper by Stamper v. Kanawha Cnty. Bd. of Educ.*, 191 W. Va. 297, 298-99, 445 S.E.2d 238, 239-40 (1994) ("Specifically, W. Va. Code, 29-12A-4(c)(3) and (4) (1986), permit liability claims to be filed against a political subdivision for injuries or death arising from the negligent failure to maintain its property.").

Under W. Va. Code § 29-12A-4(c)(3), the Commission had a duty to keep the Park in repair–this would include the fence it erected on its property. Indeed, this Court long ago noted that "municipal corporations are under a duty of exercising reasonable care in the maintenance of parks and other public enterprises of like character[.]" *Warden v. City of Grafton*, 99 W. Va. 249, 256, 128 S.E. 375, 378 (1925). Consequently, under the statute, the Commission could "be liable for [Mr. Dattoli's] injuries if [he] can demonstrate that such injuries were caused by the [Commission's] negligent failure to keep the [fence] in repair[.]" *Koffler*, 196 W. Va. at 206, 469 S.E.2d at 649. *See also Adams v. United States*, 239 F. Supp. 503, 506 (E.D. Okla. 1965) ("[W]hen one is invited into a public park for health or recreation it is the duty of the proprietor of said park to exercise ordinary care to keep the premises in a reasonably safe condition for the benefit of persons lawfully using the same. This rule of law applies even though no admission is charged."); *City of Miami v. Ameller*, 472 So. 2d 728, 729 (Fla. 1985) ("Our conclusion does not make the city an insurer of the safety of all who use its free public parks. A municipality does, however, have a duty to maintain its

8

parks in a condition reasonably safe for public use."); *City of Bloomington v. Kuruzovich*, 517 N.E.2d 408, 413 (Ind. Ct. App. 1987) ("Here, Bloomington maintained Sherwood Oaks Park as a city park open to the general public. In doing so, Bloomington incurred a duty to design the park safely and keep it free from hazards."); *McGuire v. New Orleans City Park Imp. Ass'n*, 835 So. 2d 416, 419-20 (La. 2002) ("The duty of a governmental agency or municipality operating a public park is held to keep the premises in a reasonably safe condition for those using the park and to discover any unreasonably dangerous conditions on the premises and to either correct the conditions or warn of the danger."); *City of Jackson v. Doe ex rel. J.J.*, 68 So. 3d 1285, 1289 (Miss. 2011) (Kitchens, J., concurring) ("Thus, while the creation of a public park is a discretionary governmental function involving public policy considerations, the City still has a duty to maintain the premises in a reasonably safe condition, and to protect and warn against known hazards."); *City of Anadarko v. Swain*, 142 P. 1104, 1105 (Okla. 1914) ("The city owed to adults and children alike the duty of exercising ordinary care to avoid injuring them anywhere within the boundaries of the public park, and it cannot escape liability for the death of this child by drawing a distinction between the duties the city owed to the invitees at different points or portions of the park."); *Paraska v. Scranton*, 313 Pa. 227, 229, 169 A. 434, 435 (1933) ("We have uniformly permitted recovery for negligent maintenance of parks in a long series of cases.").

Having shown as a matter of law that the Commission had a statutory duty to maintain the fence "in repair," the next step in the analysis is to determine whether the Dattolis presented a *prima facie* case of negligence in breaching that duty and causing injury to Mr. Dattoli.

**2. The Dattolis presented a *prima facie* case of the Commission's breach of its duty to keep its fence in repair.** The evidence in this case clearly showed that the Commission did not have any signs or other warnings informing patrons of the Park to not lean on its fence. Mr. Dattoli provided undisputed testimony that he looked at the fence before he leaned on it, and that the fence looked safe. There also was undisputed testimony that, when Mr. Dattoli leaned his buttocks and hand against the fence, the fence broke. There was no evidence that Mr. Dattoli did anything wrong to cause the fence to break.[11] The evidence revealed without dispute that the Dattolis sought, through discovery, to obtain all pertinent records involving the creation and maintenance of the fence by the Commission. The Commission failed to provide any such records. During the trial, the Commission's director of operations for the Park, Mr. Hargleroad, testified essentially that no such records existed.[12]

---

[11]The Commission argued that Mr. Dattoli was wrong in leaning against the fence. The jury rejected this argument by finding the Commission one hundred percent at fault in causing the accident.

[12]During the examination of Mr. Hargleroad by the Dattolis' counsel, the
(continued...)

following exchange occurred regarding maintenance of the fence:

> Q. You see where we asked [during discovery], at least in part, to describe any care, safety monitoring, repair of the split rail fence at issue?
>
> A. Yes.
>
> Q. And then tell the – answer – if I can read it.  Let me read it.  "Defendants will look to see [if] there are any documents responsive to the request."  That's the answer, right?
>
> A. Yes.
>
> Q. Are you aware of any documents that you could provide that would help us know what monitoring, what repair, was done of this particular split rail fence.
>
> A. No.
>
> Q. Okay.  And then go to No. 13.  It's at page seven.  And that question, correct me if I'm wrong, basically, just asks, "Please tell us as to the split rail fence at issue on September 1, 2007, tell us what repair took place from the time of purchase, assembly, installation, up until the incident"; right?
>
> A. That's correct.
>
> Q. And you folks indicate, am I correct, this is your answer, "The Defendants will search for any documents responsive to the request"; right?
>
> A. That's right.
>
> Q. Any you don't know of any; is that right?

(continued...)

Mr. Hargleroad also testified that the wooden fence was placed in the Park in 1990 and that wood had a life expectancy. Mr. Dattoli presented undisputed evidence that, as a result of the fence breaking and causing him to fall, he sustained a severe shoulder injury that required surgery. This evidence was sufficient to establish a *prima facie* case of negligence under the statute. That is, the Dattolis' evidence "warranted an inference of negligence on the part of [the Commission] such as entitled the [Dattolis] to have the issue determined by the jury and not determined by the directed verdict." *Jenkins v. Chatterton*, 143 W. Va. 250, 255, 100 S.E.2d 808, 810 (1957). *See also Nuclear Corp. of Am. v. Lang*, 480 F.2d 990 (8th Cir. 1973) (finding evidence sufficient to infer that accident occurred due to defendant failing to maintain fence in a proper state of repair); *Serbalik v. State*, 123 N.Y.S.2d 212, 215 (1954) ("It was the duty of the State to keep this campsite and its amusement apparatus, including the swings, in a reasonably safe condition for the intended

---

[12](...continued)
A. I don't know of any.

. . . .

Q. And the point of this is: You folks didn't have any sign up that said, "Don't lean on the fence rail"; did you?

A. That's correct.

Q. You didn't have any caution tape saying, you know, "Stay away from the split rail fence"; did you?

A. No.

12

use. The circumstances under which this swing broke established prima facie evidence of negligence."); *Kelley v. Barrett*, 897 P.2d 289, 291 (Okla. 1995) ("Plaintiff's evidence was sufficient to support an inference that when Plaintiff struck Defendant's horse on 89th Street, the horse was there because it had escaped by reason of Defendant's negligently maintained fence."); *Reed v. Clark*, 277 S.C. 310, 286 S.E.2d 384 (1982) (finding evidence of negligent failure to maintain fence sufficient to deny defendant motion for directed verdict).

The Commission was required to present some evidence to rebut this *prima facie* case. *See Laphew v. Consol. Bus Lines*, 133 W. Va. 291, 299, 55 S.E.2d 881, 886 (1949) ("[A] prima facie case, of course, does not always stand up when evidence tending to rebut is introduced[.]"); Syl. pt. 7, in part, *Fairview Fruit Co. v. H.P. Brydon & Bro.*, 85 W. Va. 609, 102 S.E. 231 (1920) ("When such facts are proven, the burden is cast upon defendant to rebut the presumption[.]"). The Commission failed to put on a case-in-chief to rebut the Dattolis' *prima facie* case. No evidence was presented by the Commission to show that the fence was in fact in good repair at the time of the accident, or that it was ever specifically inspected for safety reasons after it was installed. The Commission also failed to present any evidence that Mr. Dattoli violated any Park rule by leaning against the fence. In the absence of any evidence rebutting the Dattolis' *prima facie* case, the trial court properly denied the Commission's pre-verdict motion for judgment as a matter of law. *See Lambert v. Metro. Transit Auth.*, 339 Mass. 94, 96, 157 N.E.2d 869, 871 (1959) ("It was for

13

the jury to determine whether the defendant failed in its duty of care to users of its passageway and if the condition of the fence was found due to negligent maintenance[,] whether the injury to the boy was caused by such condition."). Indeed, our law is quite clear in holding that "[o]rdinarily the question as to whether a *prima facie* case made by a plaintiff by circumstantial evidence has been overcome by direct testimony of the defendant in conflict therewith is for the jury." Syl. pt. 2, *Webb v. Harrison*, 127 W. Va. 124, 31 S.E.2d 686 (1944). *See also* Syl. pt. 5, *Hatten v. Mason Realty Co.*, 148 W. Va. 380, 135 S.E.2d 236 (1964) ("Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them.").

It is clear to me that the majority opinion reached a result that is contrary to our law regarding the liability of a political subdivision for breaching its duty to maintain its property in repair. Compounding its error, the majority opinion further has heightened the standard for making out a *prima facie* case of negligence in general.

In view of the foregoing, I dissent. I am authorized to state that Justice Workman joins me in this dissenting opinion.

14