491 S.E.2d 618

STATE of West Virginia ex rel. Ken HECHLER, West Virginia Secretary of State, Plaintiff Below, Appellee,

v.

CHRISTIAN ACTION NETWORK, a Tax–Exempt Virginia Corporation, Defendant Below, Appellant

No. 23573.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 1997.

Decided July 16, 1997.

Darrell V. McGraw, Jr., Attorney General, Daynus Jividen, Senior Assistant Attorney General, Charleston, for Appellee.

William J. Hanna, Flaherty, Sensabaugh & Bonasso, Charleston, David Wm. T. Carroll, Columbus, OH, for Appellants.

McHUGH, Justice:

The Christian Action Network appeals the December 19, 1995 order of the Circuit Court of Kanawha County which, pursuant to the Solicitation of Charitable Funds Act found in *W. Va. Code*, 29–19–1 *et seq.*, permanently enjoined the organization from soliciting funds in West Virginia until it conspicuously places the statement mandated by *W. Va. Code*, 29–19–8 [1992] on all of its public mailings and sends a copy of each of its public mailings to the Secretary of State's office. For reasons explained below, we affirm, in part, and reverse, in part, the December 19, 1995 order of the circuit court.

## I.

The Christian Action Network is a Virginia nonprofit corporation which is registered as a lobbyist in both the United States House of Representatives and the United States Senate for the primary purpose of advocating family value issues. More specifically, the Christian Action Network's articles of incorporation state that the organization's purposes are, *inter alia:*

(a) To educate the general public and to advance the social welfare through the promotion of traditional Judeo–Christian moral values in areas of social concern, including, but not limited to, the advancement of:

(1) freedom of religious beliefs, practices, assembly and autonomy;

(2) sanctity-of-life for the unborn, the mentally and physically handicapped and the hopelessly ill;

(3) traditional interpersonal morality and . . . family values;

(4) a strong national defense; and

(5) fair taxation and elimination of wasteful spending by the Federal government;

(b) To advise the United States Congress and local and state legislative bodies and public officials about, and/or to seek legislation in furtherance of, the topics described in clause (a) above.

(c) To provide educational materials by the use, implementation and production of publications, media presentations, lectures, debates, seminars and workshops in furtherance of the nonprofit purposes of the Corporation[.]

As noted by the circuit court in its December 19, 1995 final order, the

Christian Action Network accomplishes the purposes for which it was incorporated by, *inter alia,* producing video tape programming designed to educate citizens around the country regard[ing] [the issue of homosexuals in the United States military]; by publishing a book entitled *Defending the American Family,* intended to educate Congress, 'key people inside the White House,' and 'the common public,' regarding pro-family Contract With America issues; producing television commercials, for public broadcast, regarding candidate Bill Clinton's position on homosexual issues; placing newspaper ads in large circulation newspapers regarding candidate Clinton's views on homosexuality; publishing a 'government report card' intended to help people in their home understand where their member of Congress stands on the issues of [family values, Judeo–Christian values, homosexuality and the like]; [and] circulating petitions to the public intended to encourage various corporations and agencies (*e.g.,* Levi Strauss Corp., the United Way of America) to adopt funding and contribution strategies more amenable to Christian Action Network's views on

pro-family, Judeo–Christian, and anti-homosexuality values.

(citations to record of the October 6, 1995 hearing omitted).

The Christian Action Network funds its lobbying programs by national direct mail solicitations. Indeed, in the three years it has engaged in fundraising in this State, it has collected between $10,000 and $50,000 a year from West Virginia residents. Although the Christian Action Network is exempt from income taxation pursuant to § 501(c)(4) of the Internal Revenue Code (26 U.S.C. § 501(c)(4)) (hereinafter " § 501(c)(4)"),[1] any contributions made to it are not tax-deductible, unlike the organizations qualified under § 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)) (hereinafter " § 501(c)(3)").[2]

Each year since 1992, the Christian Action Network has registered in West Virginia as a charitable organization with the Secretary of the State and has paid a registration fee pursuant to the requirements of the Solicita-

tion of Charitable Funds Act.[3] *See W. Va. Code,* 29–19–5 [1992]. However, on its 1992 registration form, the Christian Action Network noted that "[w]e are not a charity." Though the later registration forms did not contain this notation, the Christian Action Network left blank the line on the registration forms for amounts "disbursed for charitable purposes." Furthermore, the Christian Action Network did not include on any of its public mailings the following statement which is mandated by *W. Va. Code,* 29–19–8 [1992]: " 'West Virginia residents may obtain a summary of the registration and financial documents from the Secretary of State, State Capitol, Charleston, West Virginia 25305[;] [r]egistration does not imply endorsement[,]' " nor did the Christian Action Network send copies of its solicitation materials to the Secretary of State.

On February 17, 1995, the Secretary of State received a complaint from Chuck Hamsher about the Christian Action Network's solicitation activities in West Virginia.

---

1. 26 U.S.C. § 501(c)(4) (1994) organizations are [c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.
 26 U.S.C. § 501 was amended in 1996; however, the amendment does not affect our discussion in this opinion.

2. 26 U.S.C. § 501(c)(3) (1994) organizations are [c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to ) any candidate for public office.

3. *W. Va. Code,* 29–19–3(c) [1992] provided that "[t]he secretary of state shall administer this article, prescribe forms for registration or other purposes, and promulgate rules in furtherance of this article in accordance with the provisions of chapter twenty-nine-a [§ 29A–1–1 et seq.—The State Administrative Procedures Act] of this code." *W. Va. Code,* 29–19–3 was repealed in 1995 as were §§ 29–19–4 and 29–19–16 all of which mainly concerned the commission on charitable organizations whose function was to, *inter alia,* hold investigations, make recommendations to the Secretary of State on policies to effect the purposes of the Act, and to request the attorney general or prosecuting attorney to enforce the Act. *See Acts of the Legislature,* Reg. Sess., 1995, chapter 234.

 Notwithstanding the fact that the legislature chose to abolish the commission on charitable organizations in 1995, it appears from the following language found in *W. Va. Code,* 29–19–5(a) [1992], in relevant part, that the legislature intended for the Secretary of State to continue administering the Solicitation of Charitable Funds Act: "Every charitable organization ... which intends to solicit contributions within this state or to have funds solicited on its behalf shall, prior to any solicitation, file a registration statement with the secretary of state upon forms prescribed by him or her[.]" (Though *W. Va. Code,* 29–19–5 was amended in 1995, it does not affect the outcome of the case before us).

Mr. Hamsher asserted that the Christian Action Network had failed to comply with the requirements of the Solicitation of Charitable Funds Act by not including the statement required by *W. Va. Code,* 29–19–8 [1992] on its public solicitation mailings. After investigating Mr. Hamsher's complaint, the Secretary of State contacted the Christian Action Network in March and April of 1995 and directed that it comply with the Act. In response, the Christian Action Network requested the Secretary of State to withdraw its registration stating that it was not a charitable organization and, therefore, was not subject to the requirements of the Solicitation of Charitable Funds Act.

After denying the Christian Action Network's request and after the organization continued to refuse to comply with the Act, the Secretary of State filed a "Petition for Declaratory Judgment and Injunctive Relief" in the Circuit Court of Kanawha County on June 6, 1995, seeking to enjoin the Christian Action Network "from continuing unauthorized solicitation activities[.]" On July 6, 1995, the circuit court granted a preliminary injunction against the Christian Action Network stating that it was "enjoined from soliciting funds in the State of West Virginia until such time as [it was] in full compliance with the West Virginia Solicitation of Charitable Funds Act, until the final determination of this action or until this Court shall order otherwise." Thereafter, the parties agreed to limit the case to the following three issues:

(1) Is the ... Christian Action Network a 'charitable organization' as that term is defined in W. Va. Code, § 29–19–2(1)?

(2) If [the] Christian Action Network is a charitable organization, does [the] Christian Action Network have to conspicuously display, on its printed and written solicitations, the disclosure statement contained in W. Va. Code, § 29–19–8? ...

(3) If [the] Christian Action Network is a charitable organization under the Act, does it have to supply the Secretary of State with copies of its solicitation materials pursuant to W. Va. Code, § 29–19–8?

After conducting a hearing on October 6, 1995, the circuit court entered an order on December 19, 1995, concluding that the Christian Action Network was a charitable organization as that term was defined under the Solicitation of Charitable Funds Act. The circuit court also in the December 19, 1995 order permanently enjoined the Christian Action Network from soliciting funds in West Virginia until the organization conspicuously places the *W. Va. Code,* 29–19–8 [1992] statement on all of its public mailings and sends a copy of each of its public mailings to the Secretary of State's office. It is this order that the Christian Action Network appeals.

## II.

### A. *Standard of Review*

■ We are mindful that "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syl. pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996). *See also Weaver v. Ritchie,* 197 W.Va. 690, 693, 478 S.E.2d 363, 366 (1996) (Applied the above standard when reviewing whether the trial court properly granted a permanent injunction). In that this appeal is limited to three issues concerning the interpretation of the Solicitation of Charitable Funds Act, our review is *de novo.* *See Hartley Marine Corp. v. Mierke,* 196 W.Va. 669, 677, 474 S.E.2d 599, 607 (1996), *cert. denied, Hartley Marine Corp. v. Paige,* —— U.S. ——, 117 S.Ct. 942, 136 L.Ed.2d 832 (1997) ("[W]e review the circuit court's judgment de novo because it involves the interpretation of statutes which are questions of law."). *See also State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 213, 470 S.E.2d 162, 167 (1996) (" '[M]ixed questions of law and fact, like pure questions of law, or those involving statutory interpretations, are most often reviewed *de novo.*' " (citation omitted)).

### B. *Is the Christian Action Network a "charitable organization"?*

■ Our first issue is whether the Christian Action Network is a "charitable organization" which is subject to the mandates of

the Solicitation of Charitable Funds Act. The Act defines "charitable organization" as

a person [4] who is or holds itself out to be a benevolent, educational, philanthropic, humane, patriotic, religious or eleemosynary organization, or any person who solicits or obtains contributions solicited from the public for charitable purposes, or any person who in any manner employs any appeal for contributions which may be reasonably interpreted to suggest that any part of such contributions will be used for charitable purposes. A chapter, branch, area, office or similar affiliate or any person soliciting contributions within the state for a charitable organization which has its principal place of business outside the state is a charitable organization for the purposes of this article.

*W. Va. Code*, 29–19–2(1) [1992] (footnote added).[5]

The Christian Action Network asserts that the above language does not describe its organization because its primary mission "is *political issue advocacy* both at the grass roots and in the corridors of power[,]" not charity. (emphasis added). According to the Christian Action Network, any educational, religious, philanthropic or patriotic conduct is incidental to its "political advocacy" purpose. Thus, the Christian Action Network concludes that is not the type of organization that is meant to be subject to the requirements of the Solicitation of Charitable Funds Act.

Conversely, the Secretary of State asserts that the Christian Action Network is engaged in public education because it produces videos to educate the public about homosexuals in the military and it publishes books intended to educate people about the pro-family Contract with America issues. The Secretary of State asserts that his position is further supported by the Christian Action Network's articles of incorporation which state, as previously noted, that the organization's purposes are, *inter alia*, "[t]o educate the general public and to advance the social

welfare through the promotion of traditional Judeo–Christian moral values" as well as "[t]o provide educational materials … in furtherance of the nonprofit purpose of the [organization]." Thus, the Secretary of State concludes that the Christian Action Network is a "charitable organization" as that term is defined in the Solicitation of Charitable Funds Act.

■ As is apparent from the positions presented by each of the parties above, the definition of "charitable organization" in *W. Va. Code*, 22–19–2(1) [1992] is very broad, and thus, is ambiguous. We have held that "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W.Va. 693, 414 S.E.2d 454 (1992). *See also* syl. pt. 1, *State ex rel. Water Development Authority v. Northern Wayne County Public Service District*, 195 W.Va. 135, 464 S.E.2d 777 (1995). " 'The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syllabus Point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 2, *Farley, supra. See also* syl. pt. 2, *State ex rel. Water Development Authority, supra.* Moreover, " '[i]n ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984).

The legislature has made clear that

[t]he purpose of [the Solicitation of Charitable Funds Act] is to protect the people of the state of West Virginia by requiring full public disclosure by persons and organizations who solicit funds from the public and the purposes for which such funds are solicited and how they are actually used, and to prevent deceptive and dishonest statements and conduct in the

---

4. "Person" is defined as "any individual, organization, trust, foundation, group, association, partnership, corporation, society or any combination of them." *W. Va. Code*, 29–19–2(6) [1992].

5. *W. Va. Code*, 29–19–2 [1992] was amended in 1995; however, the amendments do not affect this case.

solicitation and reporting of funds for or in the name of charity.

*W. Va. Code,* 29–19–1a [1986].[6] It is clear that the legislature is seeking to provide a mechanism whereby the public can ensure that its funds are used for the purpose for which they were solicited.

The Christian Action Network asserts that the legislature, when enacting the Solicitation of Charitable Funds Act, was concerned only with the nonprofit charities described in § 501(c)(3) of the United States Internal Revenue Code, contributions to whom are deductible from the income taxes of donors. *See* n. 2, *supra.* According to the Christian Action Network, the "traditional charity" is the § 501(c)(3) charity. Although the Christian Action Network is a tax-exempt-nonprofit organization, it is not the § 501(c)(3) "traditional charity," as any donation made to it is not tax deductible. Indeed, the Christian Action Network is a § 501(c)(4) charity. *See* n. 1, *supra.* Thus, the Christian Action Network concludes it is not the "traditional charity" that the definition of "charitable organizations" in *W. Va. Code,* 29–19–2(1) [1992] meant to encompass.

To further support its argument, the Christian Action Network notes that prior to 1992 *W. Va. Code,* 29–19–5(a)(7) stated, in relevant part, that every charitable organization must file a registration statement with the Secretary of State prior to any solicitations being made, and the statement must contain "[a] copy of any determination of the organization's tax-exempt status under *section 501* of the Internal Revenue Code [26 U.S.C. § 501][.]" (emphasis added). This language included both § 501(c)(3) and § 501(c)(4) organizations.

In 1992, the legislature amended *W. Va. Code,* 29–19–5(a)(7) to state, in relevant part, that every charitable organization must file a registration statement with the Secretary of State prior to any solicitations being made, and the statement must include "[a] copy of any determination of the organization's tax exempt status under the provisions of 26 U.S.C. *§ 501(c)(3)* [.]" (emphasis added). The Christian Action Network asserts that the 1992 amendment of *W. Va. Code,* 29–19–5(a)(7) clearly indicates the legislature's intent to confine the Solicitation of Charitable Funds Act to § 501(c)(3) organizations.

We disagree. We make clear that both §§ 501(c)(3) and 501(c)(4) are non-profit tax-exempt organizations. Relevant to this case, the difference between the two sections is that contributions to § 501(c)(3) are tax-deductible whereas contributions to § 501(c)(4) are not. Although the 1992 amendment of *W. Va. Code,* 29–19–5(a)(7) provides that § 501(c)(3) organizations prove their tax exempt status, it appears that the purpose of this amendment is simply to alert donors as to which contributions to non-profit organizations are tax-deductible.

Indeed, we find it significant that while in 1992 the legislature clarified which § 501 organizations must file proof of their tax exempt status, it did not restrict the definition of "charitable organizations" found in *W. Va. Code,* 29–19–2(1) [1992] to § 501(c)(3) organizations. We have previously recognized that "courts presume the Legislature drafts and passes statutes with full knowledge of existing law." *The West Virginia Health Care Cost Review Authority v. Boone Memorial Hospital,* 196 W.Va. 326, 336, 472 S.E.2d 411, 421 (1996). Thus, if the legislature intended to clarify that § 501(c)(3) organizations are

**6.** In order to accomplish this purpose the legislature requires all charitable organizations to file a registration statement with the Secretary of State. *See W. Va. Code,* 29–19–5 [1992]. This registration statement is to include, *inter alia,* the "name of the organization and the purpose for which it was organized[,]" *W. Va. Code,* 29–19–5(a)(1) [1992], "[a] copy of a balance sheet and a statement or report of income and expenses for the organization's immediately preceding fiscal year[,]" *W. Va. Code,* 29–19–5(a)(6) [1992]; and "[t]he general purpose or purposes for which the contributions to be solicited shall be used[.]" *W. Va. Code,* 29–19–5(a)(10) [1992]. Furthermore,

all charitable organizations are required to print the statement quoted in *W. Va. Code,* 29–19–8 [1992] in a conspicuous place on any written or printed solicitation material. The Secretary of State is authorized to enforce the provisions of the Solicitation of Charitable Funds Act by, *inter alia,* bringing an action to enjoin any charitable organization, professional fund-raising counsel or professional solicitor from violating any provision of the Act. *W. Va. Code,* 29–19–15 [1990] (This section was amended in 1996; however, the amendments do not affect this case). Additionally, the Act authorizes the imposition of criminal sanctions. *Id.*

the only "charitable organizations" subject to the Solicitation of Charitable Funds Act, it could have amended the definition of "charitable organization" found in *W. Va. Code*, 29–19–2(1) [1992]. Because it did not so amend the definition of "charitable organization," this Court declines to adopt the Christian Action Network's position. As we have explained, " '[i]t is not for [courts] arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, *we are not obliged to add to statutes something the Legislature purposely omitted.*'" *Williamson v. Greene*, 200 W. Va. 421, 426, 490 S.E.2d 23, 28 (1997) (emphasis provided) (*quoting Banker v. Banker*, 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996)). *See also State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars of the United States*, 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959) ("It is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten[.]" (citation omitted)).

Moreover, we find that the Christian Action Network's self-description in its articles of incorporation includes it within the definition of "charitable organization" found in *W. Va. Code*, 29–19–2(1) [1992]. As noted earlier, the Christian Action Network describes its purposes as, *inter alia*, "[t]o educate the general public and to advance the social welfare through the promotion of traditional Judeo–Christian moral values in areas of social concern, including, but not limited to, the advancement of: (1) freedom of religious beliefs, practices, assembly and autonomy; . . . [and] (3) traditional interpersonal morality and . . . family values[.]" Clearly, the Christian Action Network "holds itself out to be a[n] . . . educational . . . organization[,]" and thus, falls within the definition of "charitable organization" found in *W. Va. Code*, 29–19–2(1) [1992]. We fail to understand how the fact that the Christian Action Network's educational purpose also involves political advocacy removes the organization from the man-

dates of Solicitation of Charitable Funds Act. Indeed, including an organization which solicits funds to further its purposes of educating the general public and advancing the social welfare "through the promotion of traditional Judeo–Christian moral values in areas of social concern" " 'give[s] effect to the intent of the Legislature[,]' " syl. pt. 2, *Farley, supra*, by "protect[ing] the people of the state of West Virginia by requiring full public disclosure by persons and organizations . . . [in order] to prevent deceptive and dishonest statements and conduct in the solicitation and reporting of funds for or in the name of charity." *W. Va. Code*, 29–19–1a [1986], in relevant part.

Our conclusion is supported by case law from other jurisdictions. For example, in *People ex rel. Hartigan v. National Anti–Drug Coalition*, 124 Ill.App.3d 269, 79 Ill. Dec. 786, 464 N.E.2d 690 (1984), the Illinois Anti–Drug Coalition and the National Anti–Drug Coalition (hereinafter the "Coalitions") argued that they were political organizations and as such were not "charitable organizations" subject to the registration requirements of the Illinois Solicitation Act, *Ill.Rev. Stat.*, 1981, chp.14, ¶¶ 51 *et seq.*[7] Similar to our Solicitation of Charitable Funds Act, the Illinois Act defines "charitable organization" as "[a]ny benevolent, philanthropic, patriotic, or eleemosynary person or one purporting to be such which solicits and collects funds for charitable purposes[.]" 225 *Ill. Comp. Stat. Ann.* 460/1(a) (West 1993), in relevant part.

Notwithstanding the Coalitions' assertion that they were strictly political organizations, the Appellate Court of Illinois concluded that they were charitable organizations subject to the registration requirements of the Solicitation Act:

> The courts in this State are in accord in applying a broad legal definition of 'charity' to include almost anything that tends to promote the improvement, well doing and well being of social man. Moreover, charitable organizations may include organizations whose primary purpose is *not* to pro-

---

7. This Act is also found in 225 Ill. Comp. Stat. Ann. 460 *et seq.* (West 1993) and the official short title of the Act is the Solicitation for Charity Act.

*See* 225 Ill. Comp. Stat. Ann. 460/0.01 (West 1993).

vide money or services for the poor, the needy or other worth objects of charity, but *to gather and disseminate information about and to advocate positions on matters of public concern.*

*Id.,* 464 N.E.2d at 694 (citation omitted and emphasis provided). *See generally* 15 Am. Jur.2d *Charities* § 3 (1976) (The legal definition of "charity" is different than its definition in common speech and includes "almost anything not forbidden by law or public policy, which tends to promote the well-doing or well-being of social man[.]"); 14 C.J.S. *Charities* § 2 (1991) ("In the legal sense, the word 'charity' has a much wider significance than in common speech; it is not confined to mere almsgiving or the relief of poverty and distress, but extends to the improvement and promotion of the happiness of man." (footnotes omitted)).

■ Accordingly, we hold that an organization which "holds itself out to be a[n] . . . educational . . . organization" is a "charitable organization" within the meaning of *W. Va. Code,* 29–19–2(1) [1992] of the Solicitation of Charitable Funds Act and, thus, is subject to the requirements of that Act. Based on the discussion above, we conclude that the Christian Action Network is a "charitable organization" as that term is defined in *W. Va. Code,* 29–19–2(1) [1992].

### C. *Is the mandated statement in W. Va. Code, 29–19–8 constitutional?*

We now address whether the Christian Action Network is required to include in all of its printed solicitations the following statement mandated by *W. Va. Code,* 29–19–8 [1992]: " 'West Virginia residents may obtain a summary of the registration and financial documents from the Secretary of State, State Capitol, Charleston, West Virginia 25305. Registration does not imply endorsement.' " [8] The parties break this issue into two parts. First, the Christian Action Network asserts that the legislature has, by requiring charitable organizations to print the statement quoted above, mandated speech in violation of the First Amendment to the *Constitution of the United States.* Second, the Christian Action Network asserts that the *W. Va. Code,* 29–19–8 [1992] requirement that the printed statement be placed in a conspicuous place on the written solicitation materials is unconstitutionally vague.

#### i. Mandated Speech Issue

■ Our discussion of this issue must begin with the fundamental premise that charitable appeals for funds are speech protected under the First Amendment of the *Constitution of the United States* and under article III, section 7 of the *Constitution of West Virginia.* [9] As the United States Supreme Court of Appeals has explained:

8. *W. Va. Code,* 29–19–8 [1992], in relevant part, also requires that

> [a]ll registered charitable organizations and their professional fund raisers and solicitors . . . to disclose in writing: (1) The name of a representative of the charitable organization to whom inquiries can be made; (2) the name of the charitable organization; (3) the purpose of the solicitation; (4) upon request of the person solicited, the estimated percentage of the money collected which will be applied to the cost of solicitation and administration or how much of the money collected will be applied directly for the charitable purpose; and (5) the number of the raffle, bingo or other such state permit used for fund raising.

The parties do not challenge the above requirements.

9. *U.S. Const.* amend. I states that "[c]ongress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to

assemble, and to petition the Government for a redress of grievances."

*W. Va. Const.* art. III, § 7 states:

> No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

As we have explained on prior occasions,

> [t]his Court must at a minimum apply the standards the Supreme Court of the United States uses to analyze First Amendment issues pursuant to *W. Va. Const.* art. I, § 1 which states: 'The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuant thereof, shall be the supreme law of the land.' . . . However, this Court has stated that pursuant to the right of the majority to 'reform, alter, or abolish' an inadequate government set

Prior authorities ... clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73, 84 (1980).[10] Thus, although charitable appeals for funds are subject to reasonable regulation, "the state bears the burden of showing that its regulation is narrowly tailored to further a strong, subordinating interest that the state is entitled to protect." *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1230 (4th Cir.1989), *cert. denied*, 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 286 (1990).[11] *See also Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 960–61, 104 S.Ct. 2839, 2849, 81 L.Ed.2d 786, 798 (1984).

■ There is no question that "[t]he interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation." *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 792, 108 S.Ct. 2667, 2675, 101 L.Ed.2d 669, 686 (1988). *See also Famine Relief Fund v. State of West Virginia*, 905 F.2d 747, 751 (4th Cir.1990) (The Supreme Court of Appeals has "acknowledged the legitimate state interest in regulating this type of speech to prevent fraud and misrepresentation. This regulation, however, must be narrowly tailored to further that interest without unnecessarily intruding upon the charities' right of free speech." (citations omitted)). *See generally* 14 C.J.S. *Charities* § 47 (1991). As we have already explained, one of the purposes of the Solicitation of Charitable Funds Act is "to prevent deceptive and dishonest statements and conduct in the solicitation and reporting of funds for or in the name of charity." *W. Va. Code*, 29–19–1a [1986]. This purpose reflects a substantial state interest which would justify a narrowly tailored regulation.

■ The Christian Action Network, however, asserts that requiring it to print on its written solicitation material the mandated statement in *W. Va. Code*, 29–19–8 [1992] is not a narrowly tailored statute which prevents fraud. In support of its position the Christian Action Network relies on *Riley, supra.*

forth in article III, § 3 of the *Constitution of West Virginia*, more stringent limitations on the government's ability to regulate free speech may be imposed under our constitutional free speech provision than is imposed on the states by the Fourteenth Amendment to the *U.S. Constitution.* *Wheeling Park Commission v. Hotel and Restaurant Employees, International Union, AFL–CIO*, 198 W.Va. 215, 221 n. 6, 479 S.E.2d 876, 882, n. 6 (1996) (citations omitted). Thus, the United States Supreme Court's analysis of the various standards that are applied to First Amendment issues is a useful starting point because "it establishes the floor below which we may not venture." *Id.*

10. The United States Supreme Court further explained that a charity's appeal for funds is not purely commercial speech, and thus, any govern-

ment regulation of such speech warrants a more stringent review: "[B]ecause charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech." *Village of Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 834, 63 L.Ed.2d at 84–85 (footnote omitted).

11. As noted in *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 795, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669, 688 (1988), "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." Thus, any statute mandating speech is a content-based regulation and as such warrants a strict scrutiny analysis. *Id.*

One of the issues in *Riley* was whether "the requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity[ ]" is constitutional. *Id.* at 795, 108 S.Ct. at 2677, 101 L.Ed.2d at 688. After noting that the percentage requirement might have an unequal affect upon charity campaigns with high costs and expenses, the Supreme Court of the United States concluded that the requirement was unconstitutional because "more benign and narrowly tailored options are available." *Id.* at 800, 108 S.Ct. at 2679, 101 L.Ed.2d at 691–92. The following are some of the options suggested by the court in *Riley:*

> [A]s a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation. Alternatively, the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements. These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored.

*Id.* at 800, 108 S.Ct. at 2679–80, 101 L.Ed.2d at 692.

We find that *W. Va. Code,* 29–19–8 [1992] is a "more benign and narrowly tailored" option than the regulation at issue in *Riley, supra.* Clearly, the mandated statement in *W. Va.Code,* 29–19–8 [1992] is a neutral statement which simply directs a donor to a place where he or she may find more information about the organization if the donor so chooses. Indeed, a state may constitutionally require a charitable organization to provide information regarding its financial documents:

> A state's regulations can require a charity to disclose its financial statements. This disclosure fosters the substantial state interests in informing the public and preventing fraud without being unduly burdensome. Financial statements document an organization's activities and are necessary for regulators and interested donors to monitor any potential mismanagement or fraud. Furthermore, any responsible organization will maintain financial records for its own internal controls.

*Famine Relief Fund,* 905 F.2d at 752. *See also Riley,* 487 U.S. at 795, 108 S.Ct. at 2676, 101 L.Ed.2d at 688. Thus, the mandated statement in *W. Va. Code,* 29–19–8 [1992] burdens no more speech than is necessary to further the substantial state interest of "prevent[ing] deceptive and dishonest statements and conduct in the solicitation and reporting of funds for or in the name of charity." *W. Va. Code,* 29–19–1a [1986].[12]

At least one other court has addressed the issue presently before us and has come to the same conclusion. In *Telco Communications, Inc., supra,* the United States Court of Appeals of the Fourth Circuit was confronted with whether the following language in a Virginia statute violated the First Amendment of the *United States Constitution:* " 'Every professional solicitor who solicits contributions from a prospective contributor in this Commonwealth: ... (iii) shall further disclose, in writing, the fact that a financial statement for the last fiscal year is available from the State Office of Consumer Affairs.' " *Id.* at 1231 (*quoting Va.Code* § 57–55.2).[13]

---

12. The Christian Action Network asserts that the mandated phrase "[r]egistration does not imply endorsement[,]" in *W. Va. Code,* 29–19–8 [1992] "suggests to the person solicited that this may be a bad charity, so avoid it." Thus, the organization concludes that the inclusion of this phrase violates its right to free speech.

We disagree. The phrase simply informs the donor that the Secretary of State is not expressing an opinion one way or the other about the charitable organization's reputation or importance.

13. The Christian Action Network asserts that *Telco Communications, Inc., supra,* is distinguishable from the case presently before us because the Virginia statute at issue in *Telco Communications, Inc.,* unlike *W. Va. Code,* 29–19–8 [1992], does not expressly dictate exactly what a charitable organization must print on its written solicitation material. We find this assertion to be

In concluding that the Virginia statute was constitutional, the court explained that

[t]he information contained in the financial statements ... is invaluable. A donor can use this information to determine if a particular solicitation is bona fide by ascertaining whether the solicitor is registered. A donor might also use this information to learn further about a solicitor's operations. Additionally, this section assists in preventing fraud. When comparative information is available, inaccuracies in inducements are less likely to occur. If they do occur, they are more likely to be discovered.

Section 57–55.2, moreover, is narrowly tailored. The statute requires that the disclosure be made in writing to prospective contributors. With respect to written solicitations, a brief notation of this nature is not a burdensome requirement.... Section 57–55.2 simply requires a similar, neutral disclosure about the availability of reports from the government. It affords 'more speech' to the public, but does not silence the solicitor.

*Id.* at 1231–32. We find the above reasoning of *Telco Communications, Inc.* to be persuasive.

Accordingly, we hold that pursuant to *W. Va. Code*, 29–19–8 [1992] of the Solicitation of Charitable Funds Act all charitable organizations must include the following statement on every printed solicitation: " 'West Virginia residents may obtain a summary of the registration and financial documents from the Secretary of State, State Capitol, Charleston, West Virginia 25305. Registration does not imply endorsement.' " The mandated statement does not violate the First Amendment to the *Constitution of the United States* or article III, section 7 of the *Constitution of West Virginia* because it burdens no more speech than is necessary to further the substantial state interest of "prevent[ing] deceptive and dishonest statements and conduct in

the solicitation and reporting of funds for or in the name of charity." *W. Va. Code*, 29–19–1a [1986].

### ii. Constitutional Vagueness Issue

■ As previously noted, the Christian Action Network maintains that the *W. Va. Code*, 29–19–8 [1992] requirement that the printed statement be "conspicuously displayed" on a "prominent part of the solicitation materials" is unconstitutionally vague.[14] The Christian Action Network does not provide any case law that directly supports its assertion. Instead, it states

[t]he ambiguity is obvious. What size type must be used to make it conspicuous? Is bold face required? All capital letters? Must it be on the front page to be prominent? Is below the signature line on the final page of the appeal letter sufficiently prominent? How about on the reply card? May it be on a separate sheet?

Conversely, the Secretary of State argues that the requirement that the printed statement be "conspicuously displayed" on a "prominent part of the solicitation materials" is not vague. As he explains, "[a]ny charity 'exercising ordinary common sense can sufficiently understand and comply with' the statutory provision." (*quoting U.S. Civil Service Comm'n v. National Assoc. of Letter Carriers, AFL–CIO*, 413 U.S. 548, 579, 93 S.Ct. 2880, 2896, 37 L.Ed.2d 796, 816 (1973), *which was superseded by statute on other grounds as stated in Bauers v. Cornett*, 865 F.2d 1517 (8th Cir.1989)).

At the outset, we note that "[t]he vagueness standard may vary depending on the type of statute involved." *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery, Co.*, 174 W.Va. 538, 546, 328 S.E.2d 144, 152 (1984), *holding modified on another point by, Gibson v. W. Va. Dept. of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991). *See also State ex rel. White v. Todt*, 197 W.Va. 334, 344, 475 S.E.2d 426, 436 (1996). Generally,

unfounded because both statutes require charitable organizations to inform any potential donors of the same information regarding where the donors may obtain more information about the soliciting organizations.

**14.** *W. Va. Code*, 29–19–8 [1992] states, in relevant part: "The disclosure statement shall be conspic-

uously displayed on any written or printed solicitation. Where the solicitation consists of more than one piece, the disclosure statement shall be displayed on a prominent part of the solicitation materials."

however, "a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Garcelon v. Rutledge*, 173 W.Va. 572, 574, 318 S.E.2d 622, 625 (1984) (*quoting Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926)). *See also Todt*, 197 W.Va. at 344, 475 S.E.2d at 436. There are two main rationales for the vagueness doctrine:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policeman, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227–28 (1972) (footnotes omitted and emphasis added). *See also Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371 (1982) (The Supreme Court of the United States stated that

the above quote from *Grayned, supra,* establishes the standards for evaluating vagueness); *Todt,* 197 W.Va. at 344, 475 S.E.2d at 436 (This Court quoted the above standard set forth in *Grayned* with approval).

■ It appears that the Christian Action Network's argument focuses on the first rationale for the vagueness doctrine: Whether the lack of "explicit standards" in *W. Va. Code,* 29–19–8 [1992]'s requirement that a charitable organization "conspicuously display[ ]" the statement mandated in that *Code* section on a "prominent part of the solicitation materials" will prevent a "person of ordinary intelligence [from having] a reasonable opportunity to know what is prohibited, so that he may act accordingly[,]," and thus, violates the due process clause found in *W. Va. Const.* art. III, § 10.[15] We agree that the due process clause found in article III, § 10 of the *Constitution of West Virginia* requires that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly.[16]

However, we do not find that the language in *W. Va. Code,* 29–19–8 [1992] regarding how the mandated statement must be printed on a charitable organization's solicitation material to be so vague as to violate the due process clause of our *Constitution.* While the requirement that a charitable organization "conspicuously display[ ]" the mandated statement in *W. Va. Code,* 29–19–8 [1992] on a "prominent part of the solicitation materi-

---

15. *W. Va. Const.* art. III, § 10 states: "No person shall be deprived of life, liberty, or property, without due process of law, and judgment of his peers."

 Similarly, *U.S. Const.* amend. V, states, in relevant part, that no person shall "be deprived of life, liberty, or property, without due process of law[.]" *U.S. Const.* amend. XIV likewise states, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law[.]"

16. In *Todt,* 197 W.Va. at 345, 475 S.E.2d at 437, we concluded that the Supreme Court of the United States has best expressed the standard which should be applied to address when laws are vague because they fail to set forth *explicit standards for those who apply them* in *Grayned, supra,* and thus, held in syl. pt. 4 that "[t]he due process clause found in article III, § 10 of the *Constitution of West Virginia* requires that laws provide explicit standards for those who apply

them so as to prevent arbitrary and discriminatory enforcement of the laws."

 Likewise, in the present case, we conclude that the Supreme Court of the United States in *Grayned, supra,* has best expressed the standard which should be applied to determine when laws are vague because they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99, 33 L.Ed.2d at 227.

 Additionally, we note that this Court has also adopted standards for determining whether a statute is vague in the criminal arena, *see* syl. pt. 2, *State v. DeBerry,* 185 W.Va. 512, 408 S.E.2d 91, *cert. denied,* 502 U.S. 984, 112 S.Ct. 592, 116 L.Ed.2d 616 (1991), and in areas involving economic matters, *see* syl. pt. 3, *Hartsock–Flesher Candy Co., supra.*

als" allows for some discretion, a person with "ordinary common sense can sufficiently understand and comply with[,]" *U.S. Civil Service Comm'n,* 413 U.S. at 579, 93 S.Ct. at 2896, 37 L.Ed.2d at 816, the requirement.

Common sense dictates that "conspicuously display[ ]" on a "prominent part of the solicitation materials" means to place the mandated statement *where the reader will see it.* People of ordinary intelligence do not need to be told what size type must be used or where the statement must be placed in order to ensure that a reader will see the statement. Accordingly, we hold that the requirement that a charitable organization "conspicuously display[ ]" the mandated statement in *W. Va. Code,* 29–19–8 [1992] on a "prominent part of the solicitation materials" is not unconstitutionally vague.

**D.** *Is the Secretary of State authorized under the Solicitation of Charitable Funds Act to require charitable organizations to file solicitation materials with his office?*

 Finally, we address whether the Secretary of State is authorized under the Solicitation of Charitable Funds Act to require charitable organizations to file with his office copies of solicitation materials mailed to the public.

The Christian Action Network asserts that there is no language in the Solicitation of Charitable Funds Act which expressly or implicitly authorizes the Secretary of State to require it to submit to his office all solicitation materials the organization sends to the public. Moreover, the Christian Action Network maintains that even if there was express or implicit authority for the Secretary of State to require the submission of solicitation materials, such requirement would violate the organization's right to free speech

and right to privacy under the United States and West Virginia constitutions.[17] More specifically, the Christian Action Network is concerned with how and in what manner the Secretary of State would determine which solicitations must be submitted to his office. For instance, must single letter appeals or personal thank you letters containing requests for money be submitted? If so, the Christian Action Network argues that allowing the government to scrutinize every private communication to its donors if the communication includes a request for money is "disturbingly intrusive[.]"[18]

Conversely, the Secretary of State asserts that pursuant to *W. Va. Code,* 29–19–8 [1992], he is implicitly authorized to require charitable organizations to submit copies of their solicitations to his office. The Secretary of State maintains that he would be unable to determine whether the charity was soliciting for charitable purposes, printing the mandated statement in *W. Va. Code,* 29–19–8 [1992] on its solicitations, or spending its funds for the charitable purposes for which the funds were raised without having a charitable organization submit a copy of its solicitation materials. In other words, the Secretary of State wants to act as a continuing "watch dog" over the activities of charitable organizations who are soliciting funds in our State. Though he does not cite to any specific statutory language, the Secretary of State further asserts that his authority to require the submission of solicitation materials only applies to the Christian Action Network's mass public mailings and not to any personal letters or thank you letters. Moreover, the Secretary of State acknowledges that he cannot require the submission of solicitation materials prior to the materials being mailed to the public. *See Telco Communications, Inc., supra* (found that Virginia's Charitable Solicitation

17. *See* n. 9, *supra* (Discusses the United States' and West Virginia's constitutional provisions regarding the right to free speech). The right to privacy is found in the Ninth Amendment to the *U.S. Const.* and in article III, section 1 of the *W. Va. Const.*

18. The Christian Action Network is particularly concerned that its private letters to donors would be accessible to the public if they were required

to be submitted to the Secretary of State given that *W. Va. Code,* 29–19–10 [1977] states that any information which must be filed with the Secretary of State under the Solicitation of Charitable Funds Act "shall become public records in the [Secretary of State's office], and shall be open to the general public for inspection at such time and under such conditions as the secretary of state may prescribe." (This *Code* section was amended in 1995; however, the amendment does not affect the case presently before us).

**86**

law, which required the submission to the government of the script of an oral solicitation at least ten days prior to the solicitation, to be an unconstitutional prior restraint on speech). Thus, the Secretary of State only requests that the Christian Action Network include him on its public mailing list.

We begin our analysis by examining the relevant statutory language of the Solicitation for Charitable Funds Act. The circuit court relied on the following language in *W. Va. Code*, 29–19–8 [1992] when concluding that the Act authorized the Secretary of State to require charitable organizations to submit to his office copies of any solicitation materials mailed to the public:

> Organizations *applying for registration shall be reviewed* according to the following standards:
>
> (a) *Charitable organizations shall include in each solicitation a clear description of programs for which funds are requested* and source from which written information is available pursuant to section thirteen [§ 29–19–13 (which describes prohibited acts) ] of this article. Expenditures shall be related in a primary degree to stated purpose (programs and activities) described in solicitations and in accordance with reasonable donor expectations. . . . [19]

(in pertinent part) (emphasis and footnote added). The Secretary of State maintains it is implicit that he receive copies of any solicitation materials being mailed to the public if he is to perform the review required in *W. Va. Code*, 29–19–8(a) [1992].

We disagree. We recognize, however, that the language in *W. Va. Code*, 29–19–8 [1992]

is not carefully drawn and thus must be construed. Therefore, we must examine the specific language in *W. Va. Code*, 29–19–8 [1992] along with other provisions of the Solicitation of Charitable Funds Act in order to give effect to the legislature's intent. *See* syl. pt. 1, *Farley, supra* (Statutes that are ambiguous must be construed before they can be applied); syl. pt. 2, *Id.* (The primary object when construing a statute is to give effect to the legislature's intent).

■ The introductory phrase of *W. Va. Code*, 29–19–8 [1992] clearly limits the Secretary of State's review to "[o]rganizations applying for registration[.]" *W. Va. Code*, 29–19–5 [1992], which is entitled "Registration of charitable organizations; fee," expressly lists what information a charitable organization must submit to the Secretary of State when registering under the Solicitation of Charitable Funds Act. Because both *W. Va. Code*, 29–19–8 [1992] and 29–19–5 [1992] concern registration, it is necessary that we read and apply these two sections together in order to comprehend the legislature's intent. As we held in syllabus point 1 of *Parkins v. Londeree*, 146 W.Va. 1051, 124 S.E.2d 471 (1962), "[i]n the construction of a legislative enactment, the intention of the legislature is to be determined, not from any single part, provision, section, sentence, phrase or word, but rather from a general consideration of the act or statute in its entirety." *See also* syl. pt. 3, *Pristavec v. Westfield Insurance Co.*, 184 W.Va. 331, 400 S.E.2d 575 (1990).

■ It appears that the legislature intended for *W. Va. Code*, 29–19–5 [1992] to set forth the information the charitable organization must submit upon registering under

**19.** *W. Va. Code*, 29–19–8 [1992], in relevant part, lists the following additional standards by which organizations *applying for registration* shall be reviewed:

> (b) Charitable organizations shall establish and exercise controls over fund-raising activities conducted for the organizations' benefit, including written contracts and agreements and assurance of fund-raising activities without excessive pressure.
>
> (c) Each charitable organization shall establish an independent governing board which shall oversee the expenditures, policies, programs and purposes of the charity's activities.

> The independent governing board shall not delegate its oversight control or authority to any other person(s) or organization.
>
> (d) Members of the independent governing board or officers of the organization shall avoid transactions involving conflict of interest on their part. . . .
>
> (e) No charitable organization, professional fund raiser or other person soliciting contributions for or on behalf of a charitable organization may use a name, symbol or statement so closely related or similar to that used by another charitable organization or governmental agency that the use thereof would tend to confuse or mislead the public.

the Solicitation of Charitable Funds Act and for *W. Va. Code*, 29–19–8 [1992] to set forth the standards by which the Secretary of State is to evaluate the information submitted pursuant to *W. Va. Code*, 29–19–5 [1994]. Though *W. Va. Code*, 29–19–5 [1992] provides a detailed list of information a charitable organization is required to submit upon registration, it does not include in that list the requirement that a charitable organization place the Secretary of State on its public mailing list. More specifically, *W. Va. Code*, 29–19–5 [1992] requires that charitable organizations file a registration statement which contains:

(1) The name of the organization and the purpose for which it was organized;

(2) The principal address of the organization and the address of any offices in this state. If the organization does not maintain an office, the name and address of the person having custody of its financial records;

(3) The names and addresses of any chapters, branches or affiliates in this state;

(4) The place where and the date when the organization was legally established, the form of its organization;

(5) The names and addresses of the officers, directors, trustees and the principal salaried executive staff officer;

(6) A copy of [the organization's financial records] . . .;

(7) A copy of any determination of the organization's tax exempt status under the provisions of 26 U.S.C. § 501(c)(3) and a copy of the last filed Internal Revenue Service form 990 and Schedule A for every charitable organization and any parent organization;

(8) Whether the organization intends to solicit contributions from the public directly or have such done on its behalf by others;

(9) Whether the organization is authorized by any other governmental authority to solicit contributions and whether it is or has ever been enjoined by any court from soliciting contributions;

(10) The general purpose or purposes for which the contributions to be solicited shall be used;

(11) The name or names under which it intends to solicit contributions;

(12) The names of the individuals or officers of the organization who will have final responsibility for the custody of the contributions;

(13) The names of the individuals or officers of the organization responsible for the final distribution of the contributions; and

(14) Copies of all contract documentation from professional fund-raising counsels and professional solicitors as provided for in subsection (d), section seven [§ 29–19–7(d) ] of this article.

*W. Va. Code*, 22–19–5 [1992]. Clearly not included in the above list of information in *W. Va. Code*, 22–19–5 [1992] is the requirement that a charitable organization when registering supply a copy of solicitation materials sent to the public. As we have held, "[i]n the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies." Syl. pt. 3, *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984). We recognize that the following language in *W. Va. Code*, 29–19–8 [1992], in relevant part, is less than enlightening: "Charitable organizations shall include in each solicitation a clear description of programs for which funds are requested[.]" However, we cannot conclude that this language implies that the Secretary of State may require the submission of solicitation materials mailed to the public *after* registration given that *W. Va. Code*, 29–19–8 [1992] clearly limits the Secretary of State's review to "[o]rganizations *applying* for registration[.]" (emphasis added).[20]

**20.** The Secretary of State has written the following interpretative rule found in 153 C.S.R. § 7–2.1 (1993): *"Each charitable organization shall submit to the Secretary of State a copy of the printed solicitation material and a copy of any script to be used in door-to-door or person-to-*

person or telephone, radio or television solicitation activities." (emphasis added). An "interpretative rule" is

every rule ... adopted by an agency independently of any delegation of legislative power which is intended by the agency to provide

If the legislature determines that the Secretary of State needs more information than that provided by the charitable organization pursuant to the registration requirements found in *W. Va. Code*, 29–19–5 [1992] in order to conduct his review of "[o]rganizations applying for registration" pursuant to the standards set forth in *W. Va. Code*, 29–19–8 [1992], then it may amend the Solicitation for Charitable Funds Act to expressly explain what additional information the Secretary of State may request.[21] This Court, however, will not under the guise of interpretation surmise what additional information would be beneficial to the Secretary of State.[22]

> information or guidance to the public regarding the agency's interpretations, policy or opinions upon the law enforced or administered by it and which is not intended by the agency to be determinative of any issue affecting private rights, privileges or interests.
>
> *W. Va. Code*, 29A–1–2(c) [1982], in relevant part. More succinctly, "[i]nterpretative rules ... do not create rights but merely clarify an existing statute or regulation." *Appalachian Power Co. v. State Tax Dept.*, 195 W.Va. 573, 583, 466 S.E.2d 424, 434 (1995). Indeed, *W. Va. Code*, 29A–1–2(c) [1982], in pertinent part, makes clear that [a]n interpretative rule may not be relied upon to impose a civil or criminal sanction nor to regulate private conduct or the exercise of private rights or privileges nor to confer any right or privilege provided by law and is not admissible in any administrative or judicial proceeding for such purpose, except where the interpretative rule established the conditions for the exercise of discretionary power as herein provided.
>
> In *Appalachian Power Co.*, 195 W.Va. at 583, 466 S.E.2d at 434, we quoted from *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 357–58 (1976), *superseded by statute/rule on other grounds as stated in Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) with approval the following analysis for judicial review of an interpretative rule:
>
> > ' " 'We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgment in a particular case will depend upon the thoroughness evident in its considerations, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " '
>
> (citation omitted).
>
> In that we conclude in this opinion that there is no statutory authority for the Secretary of State to require the submission of a copy of any printed solicitation material, we do not find 153 C.S.R. § 7–2.1 to be persuasive. Moreover, we find it noteworthy that prior to 1995 the legislature gave the Secretary of State authority to promulgate rules in furtherance of the Solicitation of Charitable Funds Act, *see W. Va. Code*, 29–19–3(c) [1992], pursuant to the State Administrative Procedures Act, *W. Va. Code*, 29A–1–1 *et seq.*; however, in 1995 the legislature repealed *W. Va. Code*, 29–19–3, removing the authority of the Secretary of State to promulgate legislative rules.

**21.** If the legislature should choose to amend the Solicitation of Charitable Funds Act it should be mindful of the holding in *Famine Relief Fund, supra*, in which the United States Court of Appeals of the Fourth Circuit found that a portion of West Virginia's Solicitation of Charitable Funds Act was unconstitutional. More specifically, the Fourth Circuit concluded that the provisions of the Act then in place which prevented a charitable organization, waiting for a judicial determination of the correctness of the administrative denial of the registration, from soliciting in West Virginia was an unconstitutional prior restraint on speech. *Id. See also Telco Communications, Inc., supra* (Found that Virginia's charitable solicitation law which required the submission to the government of the script of an oral solicitation at least ten days prior to the solicitation to be an unconstitutional prior restraint on speech). The legislature has since amended our Act in an attempt to address the problems noted in *Famine Relief Fund, supra*. We decline to address whether the legislature was successful in rectifying the problems in *Famine Relief Fund* as that issue is not before us. However, we caution the legislature to be mindful of that decision when making any amendments to the Solicitation of Charitable Funds Act.

**22.** On the surface, the Secretary of State's request that charitable organizations submit to his office solicitation materials mailed to the public may seem innocuous given that the purpose of the Solicitation of Charitable Funds Act is to "prevent deceptive and dishonest statements and conduct in the solicitation and reporting of funds for or in the name of charity." *W. Va. Code*, 29–19–1a [1986]. However, also given that " '[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion[,]' ... the government even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners[.] [Indeed], free and robust debate cannot thrive if directed by the government." *Riley*, 487 U.S. at 791, 108 S.Ct. at 2674–75, 101 L.Ed.2d at 686 (*quoting Thomas v. Collins*, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring)). Thus, it is important that any requirement which would affect a charitable organization's right to

*W. Va. Code*, 29–19–8 [1992] does not authorize the Secretary of State to require charitable organizations to submit to his office copies of any solicitation materials mailed to the public. Thus, in the present case we reverse the circuit court's holding on this issue and hold that *W. Va. Code*, 29–19–8 [1992] of the Solicitation of Charitable Funds Act does not implicitly authorize the Secretary of State to require that the Christian Action Network submit to his office a copy of any solicitation materials the organization mails to the public.

### III.

In summary, we conclude that the Christian Action Network is a "charitable organization" as that term is defined in *W. Va. Code*, 29–19–2(1) [1992] and as such must comply with the provisions of the Solicitation of Charitable Funds Act. Furthermore, the organization must print the statement mandated in *W. Va. Code*, 29–19–8 [1992] on any printed or written solicitation as this requirement does not unconstitutionally violate the

organization's right to free speech. Moreover, the requirement that a charitable organization "conspicuously display[ ]" the mandated statement in *W. Va. Code*, 29–19–8 [1992] on a "prominent part of the solicitation materials" is not unconstitutionally vague. Lastly, *W. Va. Code*, 29–19–8 [1992] of the Solicitation of Charitable Funds Act does not implicitly authorize the Secretary of State to require the Christian Action Network to send him copies of any written solicitation materials mailed to the public. Based on all of the above, we affirm, in part, and reverse, in part, the December 19, 1995 order of the Circuit Court of Kanawha County.

Affirmed, in part, and reversed, in part.

---

free speech be narrowly drawn to achieve the substantial governmental interest in preventing fraud. *See Joseph H. Munson Co., Inc.*, 467 U.S. at 960–61, 104 S.Ct. at 2849, 81 L.Ed.2d at 798.

If this Court concludes that *W. Va. Code*, 29–19–8 [1992] implicitly allows the Secretary of State to require charitable organizations to submit to his office solicitation materials mailed to the public, it would also be necessary to determine whether the statute is so narrowly drawn as to be constitutionally permissible. For instance, are all or just part of the solicitation materials of an organization required to be submitted to the Secretary of State? When must such materials be submitted to the Secretary of State? Present-

ly, the Act does not specifically address these issues. Although the current Secretary of State attempts to defend his position in a manner that recognizes the constitutional parameters of the right to free speech, there is no assurance that a succeeding Secretary of State would seek to enforce *W. Va. Code*, 29–19–8 [1992] in the same manner as the present Secretary of State.

Because of our conclusion that the language in the Act does not authorize the Secretary of State to require the Christian Action Network to submit a copy of any solicitation materials mailed to the public, we decline to further address the organization's right to free speech and right to privacy concerns.